## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

The City of Geneseo, Illinois,

        Plaintiff,

    v.

Utilities Plus,

        Defendant.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 05-2689 ADM/JJG

---

Bradley J. Lindeman, Esq., Meagher & Geer, PLLP, Minneapolis, MN, and Kevin H. Collins, Esq., Shuttleworth & Ingersoll, P.L.C., Cedar Rapids, IA, on behalf of Plaintiff.

James M. Strommen, Esq. and Mary D. Tietjen, Esq., Kennedy & Graven, Chartered, Minneapolis, MN, on behalf of Defendant.

---

## I. INTRODUCTION

On January 3, 2007, oral argument before the undersigned United States District Judge was heard on Defendant Utilities Plus's ("UP") Motion for Summary Judgment [Docket No. 50]. Also before the Court are Plaintiff the City of Geneseo, Illinois's ("Geneseo" or "the City") Objection [Docket No. 45] to the Magistrate Judge's Order of October 31, 2006 and Plaintiff's Motion to Strike [Docket No. 80]. In its Complaint [Docket No. 1], Plaintiff asserts claims for breach of contract, promissory estoppel, unjust enrichment, conversion, coercion, and fraud. For the reasons set forth herein, Defendant's Motion for Summary Judgment is granted, Plaintiff's Objection is overruled, and Plaintiff's Motion to Strike is denied.

## II.   BACKGROUND[1]

A.       **UP's Structure**

UP is a municipal joint powers organization under Minn. Stat. § 471.59.  Gavin. Aff.

[Docket Nos. 63-67] Ex. A.  That section provides that "[t]wo or more governmental units, by

agreement entered into through action of their governing bodies, may jointly or cooperatively

exercise any power common to the contracting parties or any similar powers."  Minn. Stat. §

471.59, subd. 1.  During the times relevant to the instant action, UP was comprised of two

municipal utility members.  The first is the Central Minnesota Municipal Power Agency

("CMMPA"), which sells wholesale power and related services to its member municipal utilities

in Minnesota.  Gavin Aff. Ex. A.  The second member of UP is the Midwest Municipal Gas

Agency ("MMGA"), which sells wholesale natural gas, propane, fuel oil, and related services to

its member municipal utilities in Minnesota.  Id.

UP provides services including planning, engineering, scheduling, servicing, and selling

energy to municipal members of CMMPA and MMGA, and to other municipalities in Minnesota

and other states.  Id.  UP's Joint Powers Agreement establishes a joint board of directors ("UP's

Board").  UP's bylaws, which incorporate the provisions of Minn. Stat. § 471.59, specify the

number of officers and directors, and set procedures for Board meetings and financial

distributions.  Id. Ex. B.  Among UP's officers is a chairperson, who "shall be the chief

executive officer [CEO] of Utilities Plus, shall have general management of the business . . . and

supervision of the other officers."  Id. § 3.02.  In 2005, Hal Becker ("Becker") was UP's

---

[1] On a motion for summary judgment, the Court views the evidence in the light most
favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

chairperson.  Id. Ex. C.

The bylaws also provide for UP's Board to elect a president, who "shall perform such duties as the Board of Directors may require, [and] shall have such authority as the Board of Directors may vest in him or her."  Id. Ex. B § 3.06.  Donald Kom ("Kom") was UP's President at all relevant times.  Prior to 2005, Kom acted at times as both UP's President and CEO.  Collins Decl. [Docket No. 72] Ex. WW.

**B.      2002 Agreement Between UP and Geneseo**

On April 24, 2002, Geneseo and UP executed a Power Sales and Interchange Agreement including Appendix 1 ("A1") and Appendix 2 ("A2") (the entire agreement, including A1 and A2, will be referred to as the "2002 Agreement"), for the interchange, transmission, sale, and purchase of electric capacity and energy.  Collins Decl. Ex. A.  The 2002 Agreement enables the parties to enter into transaction agreements.  Id. § 2.1.  For transactions of a day or longer, "the details of the Transaction shall be set forth or confirmed in writing in a Transaction Agreement."  Id. § 2.2.  A1 is such a transaction agreement; it provides for UP to sell energy to Geneseo on a cost plus basis.  Id. at 16.  A2 lists UP and "Geneseo Municipal Utility" as the entities buying and selling power.  Id. at 17.

The 2002 Agreement and A1 were signed by Don Kom as UP's President, and by Geneseo's Mayor.  Id. at 10-11, 17.  During discovery, UP admitted that Kom had actual authority to execute the 2002 Agreement and that the agreement is a valid contract.  Id. Ex. UU at 1.  However, the record does not contain any UP record granting Kom such authority.  Id. at 2.

**C.      Negotiations Leading to Geneseo's Approval of Appendices Three and Four**

In late 2004, Geneseo decided to solicit bids for a fixed-price contract that would replace

its cost plus arrangement with UP.  City Administrator Tim Long ("Long") was the acting superintendent for Geneseo's utility.  Long Dep. (Collins Decl. Ex. AAA; Strommen Aff. [Docket Nos. 53-62] Ex. B) at 8.  Long relied on Latham & Associates ("Latham"), an energy consulting firm, to prepare, distribute, and analyze the responses to Geneseo's Request for Proposal ("RFP").  Id. at 11; Ervin Dep. (Collins Decl. Ex. YY; Strommen Aff. Ex. B) at 75. Louie Ervin ("Ervin") was the partner at Latham with primary responsibility for assisting Geneseo with its RFP.  Long Dep. at 12.

Latham published Geneseo's RFP in January 2005.  Collins Decl. Ex. B.  The RFP sought proposals for wholesale interruptible power supply commencing May 1, 2005.  Id.  The RFP also specified that the successful bidder would likely offer a proposal that would take advantage of Geneseo's generating capacity.  Id.

On February 15, 2005, Kom responded to Geneseo's RFP on behalf of UP.  Collins Decl. Ex. C.  Geneseo received two other responses to its RFP.[2]  Id. Ex. J at 2.  Ervin telephoned Kom in late February and explained that Geneseo desired a fixed energy price contract.  Ervin Dep. at 50.  Ervin alleges Kom told him that UP had a fixed price contract with Xcel Energy and therefore UP could lock in the prices it charged Geneseo in 2004 for a period of 20 months.  Id. at 47, 50-51.  Ervin and Kom also discussed that the Midwest Independent Transmission System Operator ("MISO") would begin assessing transmission charges on April 1, 2005, and that those charges were not encompassed in the fixed price schedule.  Id. at 61-62.  On March 1, 2005, Kom stated the following in an email to Ervin:

Per our phone conversation today CMMPA/Utilities Plus would be able to "fix" the

_____

[2] Another entity expressed interest but declined to respond.  Collins Decl. Ex. J.

4

energy price for the energy supplied by Utilities Plus for the next 20 months (starting May 1, 2005).  The prices used are equal to those outlined in our RFP.  As a point of clarification, per your request—January price is $42.14 and February price is $38.42.

As di[s]cussed before, these prices exclude regulatory impacts caused by MEC/MISO, and MEC transmission costs.

Collins Decl. Ex. E.  Ervin believed Kom had authority to commit UP to the terms outlined in Kom's email.  Ervin Dep. at 85.

On March 4, 2005, Ervin solicited follow-up proposals because of changes in market conditions since the original RFP.  Collins Decl. Ex. J at 2.  After considering proposals from other suppliers, Ervin sent Kom an email on March 16 suggesting that UP and Geneseo could execute the terms outlined in Kom's March 1 email through a transaction agreement to the 2002 Agreement.  Id. Ex. F.  Kom responded on March 17 that he believed he had approval "to stick with the existing contract and not worry about new 'MISO language.'"  Id. Ex. G.  Later on March 17, Kom emailed Ervin that:

Based on our most recent phone conversation, CMMPA/Utilities Plus will be more than willing to hold our pricing, offered in our RFP response, through March 31, 2005.  We will work toward providing you with updated contract extension documents in the next day or so.

Id. Ex. H.  Upon receipt of this email, Ervin recommended that Geneseo accept UP's fixed price proposal.  Id. Ex. J at 3.  By March 18, 2005, two of the three other proposals Geneseo received in response to its request for updated proposals had expired.  Strommen Aff. Ex. D, Attachs. 15-16, 18.

On March 21, 2005, Kom emailed a draft contract for UP to purchase capacity from Geneseo.  Collins Decl. Ex. L.  On March 22, Ervin requested a draft of the interruptible energy supply contract so that he and personnel from Geneseo could review it in preparation for a

March 29 meeting, at which Geneseo's City Council planned to formally approve the capacity and interruptible energy supply contracts.  Id. Ex. M.  On March 23, Kom emailed Ervin drafts of the energy supply contract and the capacity contract.  Id. Ex. N.

Kom testified that before he emailed Ervin, UP Chief Financial Officer Jeff Pederson ("Pederson") and UP Director of Operations Steve Thompson ("Thompson") reviewed the energy supply contract.  Kom Dep. (Collins Decl. Ex. ZZ; Strommen Aff. Ex. B) at 31-32, 147, 156.  Kom, Pederson, and Thompson constituted UP's Contract Oversight Ratification Committee.  Collins Decl. Ex. K.  None was a member of UP's Board.  Gavin Aff. Ex. C.  At a March 16 meeting, UP's Administration and Operations Committee decided on a temporary policy that "[r]atification is required for any contract less than fully hedged, any contract with length greater than six months or any contract involving ten mw or more.  Such contracts shall not be offered unless approved by the Contract Oversight Ratification Committee."  Gavin Aff. ¶ 6; Collins Decl. Ex. K.  Kom's negotiations with Geneseo were not discussed at the March 16 meeting.

On the afternoon of March 23, 2005, Ervin faxed handwritten edits to Kom.  Collins Decl. Ex. O.  Kom incorporated Ervin's edits and sent the revised documents in two separate emails to Ervin on March 24, 2005.  Id. Exs. P-Q.  The capacity agreement was labeled Appendix 3 ("A3"); the energy supply agreement was labeled Appendix 4 ("A4").  Id.  Kom understood that Geneseo's City Council would meet on March 29 to decide whether to approve A3 and A4.  Kom Dep. at 21.  Ervin believed that the March 24 versions of A3 and A4 were final offers from UP.  Ervin Dep. at 150-52.  Kom testified that he had authority to send the documents, but only as drafts.  Kom Dep. at 21.

6

A4, the proposed interruptible energy supply agreement sent to Ervin by Kom, begins,

"[t]his letter shall confirm the agreement reached on April ___ 2005, between the following

Participants in the Agreement regarding the sale of electric capacity or energy under the terms

and conditions as follows: Utilities Plus (Seller) to sell and deliver; City of Geneseo, Illinois

(Buyer) to purchase and buy."  Collins Decl. Ex. Q.  After setting forth proposed terms, which

included a start date of May 1, 2005,  A4 states:

> If this confirmation correctly sets forth the terms of the Transaction that has been
> entered into, please promptly confirm to SELLER by signing below and sending this
> confirmation (or a copy hereof) to SELLER (or notifying SELLER of any bona fide error
> that would require revision in order to accurately reflect our agreement on the
> Transaction) by facsimile transmission no later than April 15, 2005.  If BUYER fails to
> so reply by such time and date, the terms hereof will be deemed withdrawn and void.

Id.  A4 contains blank signature blocks for UP's "President & CEO" and for Geneseo's Mayor.

Id.  A3, the proposed capacity agreement, contains identical introductory and concluding

language, except that Geneseo is the seller and UP is the buyer.  Id. Ex. P.  Neither A3 nor A4

were signed by Kom.  Id. Exs. P-Q.

On March 29, 2005, Geneseo's City Council passed Resolution No. 820 approving A3

and A4, and authorizing Geneseo's Mayor to sign both documents on behalf of the City.  Id. Ex.

R.  Geneseo's Mayor signed A3 and A4 on March 30.  Id. Ex. T.  On March 31, Francie Delp

("Delp"), Geneseo's Executive Secretary, sent a letter to Kom enclosing duplicates of A3 and A4

signed by Geneseo's Mayor, and a certified copy of Resolution No. 820.  Id.  Delp's letter stated

that "[w]e look forward to receiving a fully-executed copy of the documents."  Id.

**D.      Events Subsequent to Geneseo's Approval of A3 and A4**

    **1.      Discussions Regarding the Missing Signature**

In late April or early May 2005, Delp notified Long, the City Administrator, that UP had

not returned executed copies of A3 and A4. Long Dep. at 28. Long contacted Ervin, who called

Kom in early May. Ervin Dep. at 185-86. Ervin alleges Kom told him "that it was not a

problem." Ervin Dep. at 186. Both Ervin and Long believed A4 was a valid contract even

though Kom had not signed it. Id.; Long Dep. at 20-21. On the morning of May 24, Long noted

in an email to Kom that "I didn't find an original copy of our energy agreement in the file. Has

that cleared your Board and been executed yet?" Collins Decl. Ex. U. That afternoon, Kom

responded that

> I have been working with my board . . . more specifically the legal guy. His concern that
> the price table should not be in there given the fact that the end rate can be adjusted to
> correct for MISO and regulatory charges. Thereby, in his terms, unclear and leading to
> confusion. I have been working with him and the board to explain that the city and UP
> staff understand and agree on the intent. Lawyers I guess don['t] like "intent" and have
> got the board looking for clarity. I'm not at a point where I'm giving up yet! I'm
> looking at options.

Id. At his deposition, Kom testified that he had not discussed A3 or A4 with UP's legal counsel,

and that he never presented A4 to UP's Board for approval. Kom Dep. at 46, 163-64.

    **2.      UP's Invoices**

On June 14, 2005, UP faxed Geneseo an invoice for the month of May, which was the

first month the purported A4 agreement was in effect. Collins Decl. Ex. V. The invoice total

was $200,705.23, which was itemized as $200,585.76 for 4,377 megawatt hours ("mwh") of

energy, and $119.47 for "MAPP Transmission." Id. Because energy costs and MISO

transmission charges were not separately listed as contemplated by A4, Long asked Kom to

reformat the invoice.  Long Dep. at 50-51.  Kom responded that he could do so.  Id. at 51.

Shortly thereafter, Ken Stock ("Stock") was hired as Geneseo's Public Utilities Manager.  Stock

Dep. (Collins Decl. Ex. BBB; Strommen Aff. Ex. B) at 7.  Stock alleges that on his first day of

work, June 20, 2005, Kom "indicate[d] that we have a new agreement that we're operating under

and he has yet to sign it."  Id. at 15.

On June 21, 2005, UP faxed a revised invoice for May.  Collins Decl. Ex. W.  The

invoice total remained $200,705.23.  Id.  However, this total was now separated into

$175,167.54 for 4,377 mwh, $25,418.22 for "Regulatory MISO/MAPP related costs," and

$119.47 for MAPP transmission.  Id.  The revised invoice's rate of $40.02 per mwh was

consistent with the schedule set forth in A4 for May.  Because the MISO charges were greater

than expected, Ervin and Stock both contacted Kom.  Ervin Dep. at 70-71; Kom Dep. at 116;

Stock Dep. at 49.  Kom was evasive and could not provide an explanation.  Ervin Dep. at 70-71;

Kom Dep. at 116; Stock Dep. at 49.

On July 28, 2005, UP faxed the invoice for June.  Collins Decl. Ex. Z.  Prior to sending

the invoice, Kom stated in an email to Stock that he had "broken out the 'base cost' of the energy

and the MISO impacts separately [per] our discussion."  Id. Ex. Y.  On August 16, 2005, UP sent

Geneseo a revised invoice for June.  Id. Ex. AA.  Both the original and revised June invoices

showed an energy rate of $42.39 per mwh, which is the rate listed in A4 for June.  The revised

June 2005 invoice totaled $296,085.95, separated into $539.95 for MAPP transmission,

$198,554.76 for 4,684 mwh, $92,837.24 for MISO/Regulatory costs, and $4,154 for 120 mwh of

"inadvertent energy."  Id.

Also on August 16, 2005, UP faxed the July invoice.  The invoice total was $331,732.18,

which was separated into $171.18 for MAPP transmission, $240,744.24 for 4,842 mwh, and $90,816.76 in MISO/Regulatory costs. <u>Id.</u> Ex. BB. The rate of $49.72 per mwh of energy was consistent with the schedule set forth in A4 for July.

On August 18, 2005, Ervin complained in an email to Kom that "UP has been billing Geneseo for far more MISO charges than appears to be equitable." <u>Id.</u> Ex. CC. Dissatisfied with the MISO charges, Stock invited Kom to a meeting held on September 8, 2005. Stock Dep. at 70-72. At the meeting, Kom failed to account for the MISO charges. <u>Id.</u> at 72-73. Near the end of the meeting, Kom explained that UP was still operating on the cost plus basis set forth in the 2002 Agreement. <u>Id.</u> At his deposition, Kom testified there was no basis for the MISO charges, and that those charges were simply the difference between the fixed rates listed in A4 and the market rates. Kom Dep. at 125.

### 3.     Kom Notifies UP's Board

In the weeks following the September 8, 2005 meeting, Kom disclosed the details of A4 to Michael Gavin ("Gavin"), UP's legal counsel, and UP Chairperson Becker, and explained his belief that A4 was only exchanged in draft form. Gavin Aff. Ex. G at UP 01919. On September 20, UP's Administration and Operations Committee met. Collins Decl. Ex. EE. At the meeting, Paul Leland ("Leland"), Committee Member and UP Vice Chairman, was "mad at everybody," focusing his anger on Kom's dealings with Geneseo. <u>Id.</u>

In a letter of September 27, 2005, Geneseo requested information from UP regarding the MISO charges. <u>Id.</u> Ex. FF. The City asserted that UP's conduct was inconsistent with the A4 agreement. <u>Id.</u> By letter dated September 30, Gavin responded that UP's Administration and Operations Committee did not believe that UP had entered into the A4 agreement because Kom

10

never received authorization from UP's Board, and because no one executed A4 on behalf of UP.

Id. Ex. GG.  On October 5, Gavin sent a letter to Becker, Kom, Leland, UP Board Member

Collin Engebretson, and UP employee Steve Thompson, recommending that UP issue revised

invoices:

> I believe we should re-bill the City of Geneseo for all months that were billed with
> reference to the allegedly fixed pricing contained in Appendix 4.  The rebilling should be
> done pursuant to the original agreement of April 24, 2002.  That is, at our cost plus our
> adder. . . . We should probably accompany the rebills with a statement that an erroneous
> billing method was used.

Id. Ex. HH.

On October 6, 2005, Kom faxed Long a letter with reformatted invoices attached for the

months of May, June, July, and August, and an original invoice for September.  Id. Ex. II.

Kom's letter explained that "[a]fter you have reviewed the May, 2005 bill, you asked that I

reformat the bill to a format contemplated by the proposed Appendix 4 . . . .  As you probably

know, your attorney, Kevin H. Collins, objected to the revised format in his letter of September

27, 2005."  Id.  Kom's letter requested immediate payment for balances past due for July and

August.  Id.  The letter stated that UP would "continue to supply you energy under the April 24,

2002 agreement, at least until Monday, October 10, 2005."  Id.

Collins responded on October 7, 2005, indicating that Geneseo would tender the funds

under protest.  Id. Ex. JJ.  Thereafter, Geneseo paid market rates, under protest, until January 1,

2007, when Geneseo switched to another energy supplier.  Stock Dep. at 81-82.

## III. DISCUSSION

### A.     Standard of Review

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig, 54 F.3d at 470. The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**B.      Defendant's Motion for Summary Judgment**

**1.      Choice of Law**

The parties agree that the 2002 Agreement's choice of law clause specifies Minnesota law governs Geneseo's claims. See Collins Decl. Ex. A § 15.1. Nevertheless, UP's brief suggests "it is not clear" that the clause binds the Court "[b]ecause the 2002 Agreement has not been ratified by the UP Board in accordance with the law." Mem. in Supp. of Mot. for Summ. J. [Docket No. 52] at 15. However, UP admitted during discovery that the 2002 Agreement is a valid contract, and that Kom had actual authority to execute the 2002 Agreement. Collins Decl. Ex. UU at 1; see also Fed R. Civ. P. 36(b) ("Any matter admitted under this rule is conclusively established unless the court on motion permits withdrawal or amendment of the admission."). Therefore, Minnesota law clearly applies to Geneseo's claims.

**2.      Breach of Contract**

UP argues that A4 is not a contract as a matter of law because its Board never gave Kom

authority to offer A4.  In support of its argument, UP relies on cases holding that in Minnesota, apparent authority is insufficient to bind a governmental entity.  For example, in Morris v. Perpich, 421 N.W.2d 333 (Minn. Ct. App. 1988), there was a factual dispute regarding whether a county administrator made a promise that the county would pay for county attorney Morris's defense in removal proceedings.  Morris, 421 N.W.2d at 336.  However, the court emphasized that "[a]ll persons contracting with municipal corporations are conclusively presumed to know the extent of the authority possessed by the officers with whom they are dealing."  Id., quoting Jewell Belting Co. v. Village of Bertha, 97 N.W. 424, 425 (1903).  Therefore, Morris's breach of contract claim failed to survive summary judgment because there was no evidence the county board approved or ratified payment of Morris's attorney's fees.  Id.  The court noted that Morris's attorney, who received the alleged promise, "was required to ascertain whether the board had passed a resolution authorizing the payment of attorney's fees, or act at his peril."  Id.

Similarly, in Plymouth Foam Products, Inc. v. City of Becker, 944 F. Supp. 781 (D. Minn. 1996), Judge David S. Doty granted summary judgment to the City of Becker on Plymouth Foam's breach of contract and fraud claims because there was no evidence that Becker's city council had granted actual authority to its Community Development Director or its Economic Development Authority to promise funds for relocation assistance to Plymouth Foam. Plymouth Foam, 944 F. Supp. at 785.  The court also rejected Plymouth Foam's estoppel argument.  Id. at 785-86.  The Eighth Circuit affirmed on appeal.  Plymouth Foam Prods., Inc. v. City of Becker, 120 F.3d 153 (8th Cir. 1997).

Arguing against UP's Motion, the City contends that Kom had actual authority to enter into the A4 agreement.  In the alternative, the City argues that there is a question of fact as to

13

whether UP ratified A4.  The City also urges that <u>Morris</u> and <u>Plymouth Foam</u> are inapplicable in

the instant case and therefore Kom's apparent authority is sufficient to bind UP.  Finally, the

City contends that equitable estoppel prevents UP from contesting the validity of the contract.

The Court finds that Geneseo's arguments are unavailing, and that Geneseo's breach of contract

claim fails as a matter of law.

### a.      Actual Authority

The City's arguments that Kom had actual authority to enter into the A4 transaction

agreement must be analyzed by recognizing the statutory scheme for establishing joint powers

entities such as UP.  UP was formed under Minn. Stat. § 471.59, subd. 1, which provides that

multiple "governmental units . . . may jointly or cooperatively exercise any power common to

the contracting parties . . . ."  Minnesota courts have yet to precisely define the nature of a joint

powers entity:

> It is not clear whether a separate legal entity is created when governmental units
> act pursuant to the Joint Exercise of Powers Act, Minn. Stat. § 471.59.  Neither is it clear
> whether that entity has the attributes of a corporation or partnership, or is simply an agent
> acting on behalf of the principal member governmental units.
>
> We believe that the entity, if any, created . . . is in the nature of a hybrid,
> potentially possessing attributes of all the aforementioned legal relationships.  The
> precise nature of any one such entity, however, must be determined on a case by case
> basis upon a thorough analysis of the purpose for and responsibilities of the entity.

<u>In re Greater Morrison Sanitary Landfill</u>, 435 N.W.2d 92, 96 (Minn. Ct. App. 1989) (citations

omitted).

UP's members are a municipal power agency, CMMPA, and a municipal gas agency,

MMGA.  Both municipal gas agencies and municipal power agencies are municipal corporations

"deemed to be performing an essential governmental function and exercising a part of the

sovereign powers of the State of Minnesota."  Minn. Stat. §§ 453.54, subd. 1, 453A.04, subd. 1, 453.52, subd. 8, 453A.02, subd. 12.  The powers of each kind of agency "shall be exercised by its board of directors, unless otherwise provided by agency agreement or bylaws."  Minn. Stat. §§ 453.54, subd. 1, 453A.04, subd. 1.  Both municipal gas agencies and municipal power agencies may enter into contracts "on such terms and for such period of time as its board of directors determines."  Minn. Stat. §§ 453.54, subd. 15, 453A.04, subd. 15.  The purpose of a municipal power agency is to provide its members a means to secure "an adequate, economical, and reliable supply of energy."  Minn. Stat. § 453.51.  Likewise, a municipal gas agency's purpose is to allow its members to secure "an adequate, economical, and reliable supply of gas."  Minn. Stat. § 453A.01.

Since Minnesota statutes establish a default rule that CMMPA and MMGA's individual powers must be exercised by their respective boards of directors, it follows that the default rule for UP is that its powers must be exercised through its Board.  Neither the Joint Powers Agreement, nor UP's bylaws, nor any Board resolution creates an exception from this default of Board action.

The City contends that actual authority for Kom to offer A4 can be derived from the 2002 Agreement between UP and the City because the agreement does not explicitly require the approval of UP's Board for transaction agreements.  This argument is without merit, however, because of the default rule that UP's Board must exercise UP's power to contract.  The 2002 Agreement's silence on the issue can not be construed as affirmatively opting out of this default.  Moreover, under the logic of the City's argument, the City Council's approval of A4 was similarly unnecessary, and yet the City Council met and passed a resolution authorizing the

Mayor to sign A4.  The Court finds that the 2002 Agreement can not be fairly read to authorize individual officers of UP or the City to enter into transaction agreements on behalf of either party.  Therefore, the 2002 Agreement did not provide Kom with actual authority to offer A4.

The City next contends that Sections 3.06 and 5.01 of UP's bylaws gave Kom authority to enter the A4 agreement.  Section 3.06 states in part that "[t]he Board of Directors may assign to the President the duties of the principal executive officer of Utilities Plus."  Collins Decl. Ex. DDD § 3.06.  Section 5.01 states that "[a]ll . . . contracts . . . shall be signed on behalf of Utilities Plus by the Chairperson or Vice Chairperson and the Secretary or Assistant Secretary or by such other person or persons as may be designated from time to time by the Board of Directors."  Id. § 5.01.  Contrary to Geneseo's arguments, UP's bylaws can not be read to grant UP's President or CEO blanket authority to approve contracts on behalf of UP without Board approval.

Geneseo also argues that Kom, as UP's President and/or CEO, executed contracts with other parties, and UP honored those contracts without any formal Board approval.  See id. Ex. WW.  Regardless of the circumstances of those contracts, the record is devoid of any evidence that UP's Board formally granted Kom express authority to approve contracts on behalf of UP.

The City also argues that evidence of actual authority is Kom's testimony that he had the same authority at UP as he had as Executive Director of CMMPA, where Kom had "authority to enter into agreements on behalf of the agency."  Kom Dep. at 68; Collins Decl. Ex. RR.  This argument is unavailing, however, because there is no evidence that UP's Board gave Kom such authority.  Kom's perception of his authority is insufficient to create an issue of fact regarding his powers to contract on behalf of UP.

Finally, the City contends that UP's admission that Kom acted as its agent at all relevant

16

times prevents UP from arguing that Kom, UP's President, and former CEO, lacked authority to enter into the A4 agreement.  See Compl. ¶ 7; Answer [Docket No. 6] ¶ 7.  However, UP's admission that Kom acted as its agent does not define the scope of Kom's authority.  In short, the record can not support a finding that Kom had actual authority to enter the A4 agreement.

       b.       **Apparent Authority**

In the alternative, the City relies on the general rule that "[a] principal is bound not only by an agent's actual authority but also by authority that the principal has apparently delegated to the agent."  Powell v. MVE Holdings, Inc., 626 N.W.2d 451, 457 (Minn. Ct. App. 2001).  The City argues that Morris and Plymouth Foam, which held that an agent's apparent authority was insufficient to bind a county and city, respectively, are distinguishable from the instant case because Minnesota statutes provide specific directives for cities and counties in exercising their contractual power.  See Minn. Stat. § 412.201 ("Every contract . . . shall be executed on behalf of the city by the mayor and clerk, with the corporate seal affixed, and only pursuant to authority from the council."); Minn. Stat. § 373.02 ("Deeds and other written instruments made by the county shall be executed in its name by the chair of the county board and by the clerk of the board.").

However, as discussed above, Minnesota statutes specifically contemplate that a Joint Powers Agreement can create a Joint Powers Board to exercise the joint powers that are the subject of the agreement.  Neither UP's Joint Powers Agreement nor UP's bylaws specifically grant UP's President the power to approve contracts.  Although it appears that UP's Board allowed Kom, as President and/or CEO, to sign contracts on behalf of UP, there is no formal Board resolution that gave Kom discretion to approve contracts beyond the knowledge of UP's

17

Board.  Absent such a resolution, the Court finds that <u>Morris</u> and <u>Plymouth Foam</u> apply in the instant case, and therefore Kom's apparent authority was insufficient to bind UP to the purported A4 contract.

Arguing against this result, Geneseo relies on <u>City of Staples v. Minnesota Power & Light Co.</u>, 265 N.W. 58 (Minn. 1936).  There, the City of Staples contracted with Minnesota Power & Light for the purchase of electric power for a period of ten years.  <u>City of Staples</u>, 265 N.W. at 59.  After five years of performance, the City of Staples brought a declaratory judgment action to void the contract, arguing, inter alia, that Staples's city council approved the contract by motion rather than by a resolution as required by the city charter.  <u>Id.</u>  The Minnesota Supreme Court held that, "in providing water and electricity for its inhabitants, a municipality acts in its proprietary capacity.  Contracts relating thereto are governed by the same rules of contract law regarding laches and estoppel as those of private corporations or individuals."  <u>Id.</u> (citations omitted).  Therefore, after five years of performing under the contract, Staples had effectively ratified the contract and was prevented by laches and estoppel from contending the contract was void.  <u>Id.</u>

Based on <u>City of Staples</u>, Geneseo argues that in selling power, UP was engaged in a proprietary function and therefore normal contract rules such as apparent authority apply. However, the court in <u>City of Staples</u> noted that although providing electricity was a proprietary function, "[t]he argument for the city would doubtless prevail were the contract still wholly executory . . . or even, in a proper case, where it remains in an early stage of performance."  <u>Id.</u> at 60.

The facts of the instant case are distinguishable from <u>City of Staples</u>.  The Staples city

council was aware at all times of the contract, and had approved it, albeit through an incorrect

procedure.  In the instant case, there is no evidence that UP's Board was aware of A4 until

September 2005, at which point UP immediately notified Geneseo that it did not recognize A4.

Further, while the parties in City of Staples had operated under the disputed contract for five

years before the city evinced a desire to contest the contract, in the instant case, Geneseo was put

on notice that UP's Board had not authorized A4 within a month of A4's start date.  On May 24,

2005, Long inquired as to whether A4 had cleared UP's Board.  Kom's response, though evasive

and perhaps false, was that he had been working with UP's legal counsel "and the board to

explain that the city and UP staff understand and agree on the intent.  Lawyers I guess don['t]

like 'intent' and have got the board looking for clarity.  I'm not at a point where I'm giving up

yet!  I'm looking at options."  Collins Decl. Ex. U.  Thus, within a month of the purported start

date of A4, the City had notice that UP's Board had not approved A4.  On these facts, Geneseo

can not show that Kom's subsequent acts amounted to UP's ratification of A4.

Geneseo also relies on Southern Minnesota Municipal Power Agency v. Boyne, 578

N.W.2d 362, 366 (Minn. 1998), where the Minnesota Supreme Court held that neither

Minnesota's Open Meeting Law, Minn. Stat. § 471.705, nor its Data Practices Act, Minn. Stat.

§§ 13.01-.99, applies to municipal power agencies.  The court found that "the private corporation

powers granted to SMMPA by the enabling legislation" prevailed to the extent they conflicted

with the Data Practices Act and the Open Meeting Law.  Boyne, 578 N.W.2d at 366.  Since joint

powers entities like UP also have private corporation powers, Geneseo contends the presumption

in Morris that "[a]ll persons contracting with municipal corporations are conclusively presumed

to know the extent of the authority possessed by the officers with whom they are dealing" is

inapplicable.  421 N.W.2d at 336.  The Court finds, however, that <u>Boyne</u> represents only a narrow exception to the Data Practices Act and Open Meeting Law.  No authority holds that municipal power agencies, municipal gas agencies, or joint powers entities in Minnesota can be contractually bound by an agent's apparent authority.

### c.   Equitable Estoppel

Geneseo also contends the doctrine of equitable estoppel applies.  To establish a claim of equitable estoppel against a governmental entity such as UP, Geneseo must show: (1) UP misrepresented a material fact; (2) UP knew the representation was false; (3) UP intended that its representation be acted upon; (4) Geneseo did not know the facts; and (5) Geneseo relied upon UP's misrepresentation to its detriment.  <u>REM-Canby, Inc. v. Minn. Dep't of Human Servs.</u>, 494 N.W.2d 71, 74 (Minn. Ct. App. 1992).  The doctrine is addressed to the discretion of a court, which must "weigh the public interest frustrated by the application of estoppel against the equities of the case." <u>Id.</u> at 74-75.

Geneseo contends that Kom knowingly made false representations regarding the MISO charges in the reformatted May through July 2005 invoices.  However, there is no evidence Kom told anyone at Geneseo that he could contract without the approval of UP's Board.  Further, there is no evidence that Kom stated that UP's Board had approved A4.  In fact, in late May 2005  Kom indicated that UP's Board had yet to approve A4.  On these facts, Geneseo can not prevail on the equities because it was put on notice before the reformatting that UP's Board had not approved A4.

Since the record can not support a finding of breach of contract, summary judgment is granted to UP on Geneseo's breach of contract claim.

### 3.    Promissory Estoppel

The City's promissory estoppel claim also fails as a matter of law.  "Promissory estoppel is an equitable doctrine that implies a contract in law where none exists in fact."  <u>Greuling v. Wells Fargo Home Mortgage, Inc.</u>, 690 N.W.2d 757, 761 (Minn. Ct. App. 2005) (quotation and citation omitted).  The elements of promissory estoppel are: (1) a clear and definite promise; (2) the promisor intended to induce reliance and such reliance occurred; and (3) injustice will result if the promise is not enforced.  <u>Id.</u>  Further, the promisee's reliance must be reasonable.  <u>Faimon v. Winona State Univ.</u>, 540 N.W.2d 879, 882 (Minn. Ct. App. 1995).  Here, Geneseo's claim fails as a matter of law because it was unreasonable as a matter of law for Long and Ervin to assume Kom had actual authority to offer A4.  As with cities and counties, the Court finds that "[a]ll persons contracting with [joint powers entities] are conclusively presumed to know the extent of the authority possessed by the officers with whom they are dealing."  <u>Morris</u>, 421 N.W.2d at 336.  Thus, absent an official act by UP's Board indicating that Kom had authority to offer A4, Geneseo's reliance on Kom's purported offer was unreasonable as a matter of law.

### 4.    Unjust Enrichment

To prevail on its unjust enrichment claim, Geneseo must show that UP "knowingly received something of value to which [UP] was not entitled and that the circumstances are such that it would be unjust for [UP] to retain the benefit."  <u>Mon-Ray, Inc. v. Granite Re, Inc.</u>, 677 N.W.2d 434, 440 (Minn. Ct. App. 2004).  Geneseo's unjust enrichment claim is premised on the theory that after May 1, 2005, UP was not entitled to payments greater than those specified in A4.  However, as discussed above, Geneseo can not show that A4 was a contract, and it was unreasonable as a matter of law for Geneseo to rely on Kom's apparent authority.  Therefore,

21

Geneseo can not rely on A4 to show that UP received payments it was not entitled to.  At all relevant times, UP charged Geneseo on the cost plus basis specified by the 2002 Agreement. The invoices reformatted by Kom did not alter the total amount Geneseo paid.  There is no evidence that UP received anything to which it was not entitled, and Geneseo can not prevail on its unjust enrichment claim.

### 5.      Conversion

Conversion is "an act of willful interference with personal property, done without lawful justification by which any person entitled thereto is deprived of use and possession." DLH, Inc. v. Russ, 566 N.W.2d 60, 71 (Minn. 1997) (quotation and citations omitted).  In support of its conversion claim, Geneseo contends "UP has forced Geneseo to pay market prices for energy notwithstanding the parties' fixed-price agreement."  Mem. in Opp. to Mot. for Summ. J. [Docket No. 71] at 42.  As discussed above, however, Geneseo can not show that the parties entered into the A4 agreement.  Therefore, Geneseo can not rely on a breach of contract theory to support a conversion claim.  Geneseo also contends that UP has admitted performance under A4.  This contention is based on a June 2006 email by Larry Blaine, UP's Chief Financial Officer, recognizing that based on Kom's reformatting of the May, June, and July 2005 invoices, "we behaved for a period of time as if we did have a new contract."  Collins Decl. Ex. OO. However, as discussed above, Kom's actions did not constitute ratification by UP's Board. Since there was no breach of contract and no ratification, Geneseo's conversion claim must fail.

### 6.      Fraud

To prevail on its fraud claim, Geneseo must show: "(1) a false representation of a material fact, (2) made with knowledge of the falsity . . . , (3) made with the intention to induce

[Geneseo] to act in reliance on the statement, (4) that the representation caused [Geneseo] to act in reliance, and (5) pecuniary damage." The Baer Gallery, Inc. v. Citizen's Scholarship Found. of Am., Inc., 450 F.3d 816, 820 (8th Cir. 2006).  Geneseo's reliance must be reasonable.  Id. Geneseo argues that the May through July 2005 invoices that Kom reformatted to show exorbitant MISO charges were fraudulent.  However, Geneseo did not act in reliance on those invoices.  Instead, Geneseo's reliance occurred in March 2005 when, in light of the representations made by Kom regarding UP's ability to offer a fixed price contract, Geneseo allowed other proposals in response to its RFP to expire.  In doing so, Geneseo assumed Kom had authority to offer fixed prices on behalf of UP.  As discussed above, Kom lacked such authority, and it was unreasonable for Geneseo to rely on Kom's apparent authority.  Therefore, Geneseo's fraud claim must fail because its reliance on Kom's apparent authority was unreasonable as a matter of law.

   7.    **Coercion**

   To prevail on its coercion claim, Geneseo must demonstrate that UP committed "some wrong or unlawful act . . . sufficient to constrain [Geneseo], against its will, to do . . . something which [Geneseo] has a legal right to . . . refuse to do, and resulting in damage to [Geneseo]." Pillsbury Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 425 N.W.2d 244, 251 (Minn. Ct. App. 1988).  Geneseo argues that Kom's October 6, 2005 letter was coercive because it implied that UP would stop providing power to Geneseo unless Geneseo paid the market rates contemplated by the 2002 Agreement.  Geneseo's coercion claim must fail because it is premised on the validity of the A4 contract.  As discussed above, A4 never became a binding contract because UP's Board never approved it.  Therefore, Kom's letter, requesting payment in accordance with

the 2002 Agreement, did not amount to wrong or unlawful conduct.

**C.    Plaintiff's Objection to Magistrate Judge's Order**

Geneseo objects to Magistrate Judge Jeanne J. Graham's October 31, 2006 Order

[Docket No. 44] denying Geneseo's Motion to Amend the Complaint [Docket No. 23].  In its

Motion to Amend, Geneseo sought to add an allegation that UP improperly charged Geneseo for

inadvertent energy.  A magistrate judge's order on nondispositive pretrial matters will be

reversed only if it is clearly erroneous or contrary to law.  Fed. R. Civ. P. 72(a).

Magistrate Judge Graham denied Geneseo's Motion, filed on August 18, 2006, because

Geneseo failed to show good cause for extending the Pretrial Scheduling Order's [Docket No.

13] May 1, 2006 deadline for motions to amend the pleadings.  See Fed R. Civ. P. 16(b) ("A

schedule shall not be modified except upon a showing of good cause . . . .");  In re Milk Prods.

Antitrust Litig., 195 F.3d 430, 437-38 (8th Cir. 1999) (discussing situations where Rule 16's

good cause standard applies).  The facts relevant to Geneseo's Motion to Amend are thoroughly

explained in Judge Graham's Order.  In short, Geneseo first questioned UP's inadvertent energy

charges in August 2005.  In February or March 2006, personnel at Geneseo further discussed the

charges and subsequently decided to commence an audit, which was completed in late June

2006.  Geneseo contends it filed its Motion to Amend as soon as Ken Stock, its Public Utilities

Manager, determined that UP had incorrectly charged for inadvertent energy.

Magistrate Judge Graham's Order found these facts did not constitute good cause for two

independent reasons.  First, Judge Graham found that discrepancies between Stock's deposition

testimony and his Affidavit [Docket No. 37] supporting Geneseo's Motion to Amend

undermined Geneseo's argument that it was prevented by a lack of knowledge of the

circumstances from filing a motion to amend at an earlier date.  Alternatively, Judge Graham found that:

> Even if Plaintiff was uncertain as to the magnitude of the inadvertent energy problems in late 2005, the Court finds that at a minimum Plaintiff could have sought an extension of the deadline for filing a motion to amend in order to complete the energy audit that was commenced in early Spring 2006, in order to provide itself time to ascertain the magnitude of the inadvertent energy issue.  Under these circumstances, The City could have requested such an extension from the Court in advance of the expiration of the deadline on May 1, 2006.

October 31, 2006 Order at 7-8.  Geneseo's Brief in Support of its Objection [Docket No. 46] does not directly address Judge Graham's alternative reasoning.  This Court finds that Judge Graham's denial of Geneseo's Motion to Amend was neither clearly erroneous nor contrary to law.  Therefore, Geneseo's Objection is overruled.[3]

**D.      Motion to Strike**

Geneseo requests that the following items be stricken from the record: (1) portions of UP's Reply [Docket No. 74] in support of summary judgment that refer to an alleged merger between UP's Board of Directors and CMMPA's Board of Directors, and (2) the Supplemental Affidavit of Michael M. Gavin [Docket No. 78] filed in support of UP's Reply.  Geneseo contends these items should be stricken because of UP's failure to disclose evidence of the alleged merger during discovery.  The Court has not relied on evidence of the alleged merger as a basis for granting summary judgment to UP.  Therefore, Geneseo's Motion to strike is denied as moot.

---

[3] In reaching this conclusion, the Court finds it unnecessary to address Judge Graham's first ground for denying Geneseo's Motion to Amend.

**IV. CONCLUSION**

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.      Defendant Utilities Plus's Motion for Summary Judgment [Docket No. 50] is

     **GRANTED**;

2.      Plaintiff the City of Geneseo, Illinois's Objection to the Magistrate Judge's Order

     of October 31, 2006 [Docket No. 45] is **OVERRULED**; and

3.      Plaintiff's Motion to Strike [Docket No. 80] is **DENIED AS MOOT**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

                                    BY THE COURT:


                                    _____s/Ann D. Montgomery_____
                                    ANN D. MONTGOMERY
                                    U.S. DISTRICT JUDGE

Dated:  April 3, 2007.